1 **ROBERT H. REXRODE, III**
California State Bar No. 230024
2 427 C Street, Suite 300
San Diego, California  92101
3 Telephone:  (619) 233-3169, Ext. 13
Facsimile:  (619) 684-3553
4 robert_rexrode@rexrodelawoffices.com

5
Attorneys for Ms. Yvonne Martinez
6

7
UNITED STATES DISTRICT COURT
8
SOUTHERN DISTRICT OF CALIFORNIA
9
(**HONORABLE M. JAMES LORENZ**)
10
UNITED STATES OF AMERICA,      )    CASE NO.  07cr3354-L
11                              )
                Plaintiff,     )
12 v.                          )    STATEMENT OF FACTS AND
                               )    MEMORANDUM OF POINTS AND
13 YVONNE ANN MARTINEZ,         )    AUTHORITIES IN SUPPORT OF
                               )    DEFENDANT'S MOTIONS.
14              Defendant.      )
_____ )
15

16                              **I.**

17                    **FACTUAL HISTORY**[1]

18        On November 16, 2007, Ms. Martinez sought to cross into the United States at the San

19 Ysidro Port of Entry.  Agents found two people hidden in the car driven by Ms. Martinez and

20 arrested her.  About five hours later, two other agents questioned Ms. Martinez.  During the

21 interrogation, Ms. Martinez denied knowing there were two people hidden in the car she was

22 driving.  The agents seemed not to believe her.

23        On December 12, 2007, the government indicted Ms. Martinez on four counts of

24 violating 8 U.S.C. § 1324.  The government secured this indictment from the January 2007

25 Grand Jury.

26

27
        [1]The following facts are based on information provided by the government.  Ms. Martinez
28 does not admit their accuracy and reserves the right to challenge them.

1                                                   **II.**

2                                    **MOTION COMPEL DISCOVERY**

3        Ms. Martinez requests the following discovery.  Her request is not limited to those

4   items that the prosecutor knows of.  It includes all discovery listed below that is in the

5   custody, control, care, or knowledge of any "closely related investigative [or other]

6   agencies." *See United States v. Bryan*, 868 F.2d 1032 (9th Cir. 1989).

7        (1)  Brady Information.  The defendant requests all documents, statements, agents'

8   reports, and tangible evidence favorable to the defendant on the issue of guilt and/or which

9   affects the credibility of the government's case.  Under *Brady v. Maryland*, 373 U.S. 83

10  (1963), impeachment as well as exculpatory evidence falls within the definition of evidence

11  favorable to the accused.  *United States v. Bagley*, 473 U.S. 667 (1985); *United States v.*

12  *Agurs*, 427 U.S. 97 (1976).

13       (2)  Any Proposed 404(b) Evidence.  The government must produce evidence of prior

14  similar acts under Fed. R. Crim. P. 16(a)(1) and Fed. R. Evid. 404(b) and any prior

15  convictions which would be used to impeach as noted in Fed. R. Crim. P. 609.  In addition,

16  under Fed. R. Evid. 404(b), "upon request of the accused, the prosecution . . . shall provide

17  reasonable notice in advance of trial . . . of the general nature" of any evidence the

18  government proposes to introduce under Fed. R. Evid. 404(b) at trial.  The defendant requests

19  notice two weeks before trial to give the defense time to investigate and prepare for trial.

20       (3)  Request for Preservation of Evidence.  The defendant requests the preservation

21  of all physical evidence that may be destroyed, lost, or otherwise put out of the possession,

22  custody, or care of the government and which relate to the arrest or the events leading to the

23  arrest in this case.  This request includes, but is not limited to, the results of any fingerprint

24  analysis, the defendant's personal effects, and any evidence seized from the defendant or any

25  third party.

26       (4)  Defendant's Statements.  The defendant requests disclosure and production of all

27  statements made by the defendant.  This request includes, but is not limited to, the substance

28

1 of any oral statement made by the defendant, Fed. R. Crim. P. 16(a)(1)(A), and any written

2 or recorded statement made by the defendant.  Fed. R. Crim. P. 16(a)(1)(B)(i)-(iii).

3    (5)  Tangible Objects.  The defendant seeks to inspect and copy as well as test, if

4 necessary, all other documents and tangible objects, including photographs, books, papers,

5 documents, alleged narcotics, fingerprint analyses, vehicles, or copies of portions thereof,

6 which are material to the defense or intended for use in the government's case-in-chief or

7 were obtained from or belong to the defendant.  Fed. R. Crim. P. 16(a)(1)(E).

8    (6) Expert Witnesses.  The defendant requests the name, qualifications, and a written

9 summary of the testimony of any person that the government intends to call as an expert

10 witness during its case in chief.  Fed. R. Crim. P. 16(a)(1)(G).

11    (7) Witness Addresses.  The defendant requests access to the government's witnesses.

12 Thus, counsel requests a witness list and contact phone numbers for each prospective

13 government witness.  Counsel also requests the names and contact numbers for

14 witnesses to the crime or crimes charged (or any of the overt acts committed in furtherance

15 thereof) who will not be called as government witnesses.

16    (8) Jencks Act Material.  Ms. Martinez requests production in advance of trial of

17 material discoverable under  the Jencks Act, 18 U.S.C. § 3500.  Advance production will

18 avoid needless delays at pretrial hearings and at trial.  This request includes any "rough"

19 notes taken by the agents in this case.  This request also includes production of transcripts

20 of the testimony of any witness before the grand jury.  *See* 18 U.S.C. § 3500(e)(1)-(3).

21    (9) Informants and Cooperating Witnesses.  Ms. Martinez requests disclosure of the

22 name(s), address(es), and location(s) of all informants or cooperating witnesses used or to

23 be used in this case, and in particular, disclosure of any informant who was a percipient

24 witness in this case or otherwise participated in the crime charged against Ms. Martinez.

25 *Roviaro v. United States*, 353 U.S. 52, 61-62 (1957).  The government must disclose any

26 information derived from informants which exculpates or tends to exculpate Ms. Martinez.

27 *Brady v. Maryland*, 373 U.S. 83 (1963).  The government must disclose any information

28 indicating bias on the part of any informant or cooperating witness.  *Id.*

1    (10) **Specific Discovery Requests**

2    **a. request for "tecs."**

3    Ms. Martinez requests product of any "tecs" related to her or the car she was

4 arrested in, or any such "tec" searches run.  This information is discoverable under *United*

5 *States v. Vega*, 188 F.3d 1150 (9th Cir. 1999).  Alternatively, and based upon defense

6 counsel's viewing of Ms. Martinez's recorded statement to agents, it is discoverable under

7 Fed. R. Crim. P. 16 (1)(E)(i).

8    **b. request to view the car.**

9    Ms. Martinez requests access to the car in which she was arrested.  *See* Fed.

10 R. Crim. P. 16 (1)(E)(i).

11    **c. request to view the cellular phone.**

12    Ms. Martinez requests access to the cellular phone agents found in the car in

13 which she was arrested.  She also requests advance notice of the type of cellular phone it is,

14 so that she may bring a phone charger with her to view the cellular phone.  *See* Fed. R. Crim.

15 P. 16 (1)(E)(i).

16    **d. request for access to a-files.**

17    Ms. Martinez requests access to the immigration, or "A-Files," of the two

18 material witnesses involved in this case.  *See* Fed. R. Crim. P. 16 (1)(E)(i).

19    **e. request for expert disclosure.**

20    Ms. Martinez specifically requests expert notice and discovery related to any

21 tests conducted on the gas tank, or alternate fuel source, related to the car in which she was

22 arrested.  . *See* Fed. R. Crim. P. 16 (1)(F)-(G).

23    (11) Residual Request. Ms. Martinez intends by this discovery motion to invoke her

24 rights to discovery to the fullest extent possible under the Federal Rules of Criminal

25 Procedure and the Constitution and laws of the United States.

26 //

27 //

28 //

1

### III.

2

### MOTION TO DISMISS INDICTMENT DUE TO MISINSTRUCTION

3

**A.  Introduction**

4      The indictment in this case was returned by the January 2007 grand jury.  That grand

5   jury was instructed by the Honorable Larry A. Burns, United States District Court Judge on

6   January 11, 2007.  *See Reporter's Partial Transcript of the Proceedings*, dated January 11,

7   2007.[2]  Judge Burns' instructions deviate from the instructions at issue in the major Ninth

8   Circuit cases challenging a form grand jury instruction previously given in this district in

9   several ways.[3]

10     After repeatedly emphasizing to the grand jurors that probable cause determination

11   was their sole responsibility, *see* Ex. A at 3, 3-4, 5,[4] Judge Burns instructed the grand jurors

12   that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by

13   Congress; that is, whether or not there should be a federal law or should not be a federal law

14   designating certain activity [as] criminal is not up to you." *See id.* at 8.  The instructions go

15   beyond that, however, and tell the grand jurors that, should "you disagree with that judgment

16   made by Congress, then your option is not to say 'well, I'm going to vote against indicting

17   even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even

18

---

19     [2]The following motion has been litigated extensively in this district.  District Judge Barry Ted
Moskowitz entered a written decision on this motion in *United States v. Martinez-Covvarrubias*, No.
20   07cr0491-BTM.  Given the size of the transcripts under consideration, and as both the government
and the Court likely have these transcripts, Ms. Martinez has **not** attached either of the two
21   transcripts he cites to in this motion.  The first transcript referred to is the *Reporter's Partial
Transcript of the Proceedings*, dated January 11, 2007.  Ms. Martinez refers to this transcript as
22   "Exhibit A" throughout this motion.  The second transcript cited to by Ms. Martinez is the *Partially
redacted, transcripts of the grand jury impanelment proceedings*.  Ms. Morales refers to this
23   transcript as "Exhibit B" throughout this motion.  If the Court prefers, Ms. Martinez is happy to
24   provide a copy of these transcripts.

25     [3]  *See, e.g.*, *United States v. Cortez-Rivera*, 454 F.3d 1038 (9th Cir. 2006); *United States v.
26   Navarro-Vargas*, 408 F.3d 1184 (9th Cir.) (en banc), *cert. denied*, 126 S. Ct. 736 (2005) (*Navarro-
Vargas II*); *United States v. Navarro-Vargas*, 367 F.3d 896 (9th Cir. 2004)(*Navarro-Vargas I*);
27   *United States v. Marcucci*, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

28     [4]  *See also id.* at 20 ("You're all about probable cause.").

1    though the evidence may be insufficient.'" *See id.* at 8-9. Thus, the instruction flatly bars the

2    grand jury from declining to indict because the grand jurors disagree with a proposed

3    prosecution.

4         Immediately before limiting the grand jurors' powers in the way just described, Judge

5    Burns referred to an instance in the grand juror selection process in which he excused three

6    potential jurors. *See id.* at 8.

7         I've gone over this with a couple of people. You understood from the
          questions and answers that a couple of people were excused, I think three in
8         this case, because they could not adhere to the principle that I'm about to tell
          you.

9

10   *Id.* That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect

11   to their disagreement with Congress. *See id.* at 8-9. Thus, Judge Burns not only instructed

12   the grand jurors on his view of their discretion; he enforced that view on pain of being

13   excused from service as a grand juror.

14        For example, in one of his earliest substantive remarks, Judge Burns makes clear that

15   the grand jury's sole function is probable cause determination.

16        [T]he grand jury is determining really two factors: "do we have a reasonable
          belief that a crime was committed? And second, do we have a reasonable
17        belief that the person that they propose that we indict committed the crime?"
          If the answer is "yes" to both of those, then the case should move forward. If
18        the answer to either of the questions is "no," then the grand jury should not
          hesitate and not indict.

19

20   *See* Exhibit B at 8.[5] In this passage, Judge Burns twice uses the term "should" in a context

21   that makes clear that the term is employed to convey instruction: "should" cannot reasonably

22   be read to mean optional when it addresses the obligation not to indict when the grand jury

23   has no "reasonable belief that a crime was committed" or if it has no "reasonable belief that

24   the person that they propose that we indict committed the crime."

25        Equally revealing are Judge Burns' interactions with two potential grand jurors who

26   indicated that, in some unknown set of circumstances, they might decline to indict even

27

28
          [5]*Please see* footnote 2, *supra*.

1   where there was probable cause. Because of the redactions of the grand jurors' names,

2   Ms. Martinez will refer to them by occupation. One is a retired clinical social worker

3   (hereinafter CSW), and the other is a real estate agent (hereinafter REA). The CSW

4   indicated a view that no drugs should be considered illegal and that some drug prosecutions

5   were not an effective use of resources. *See id.* at 16. The CSW was also troubled by certain

6   unspecified immigration cases. *See id.*

7        Judge Burns made no effort to determine what sorts of drug and immigration cases

8   troubled the CSW. He never inquired as to whether the CSW was at all troubled by the sorts

9   of cases actually filed in this district, such as drug smuggling cases and cases involving

10  reentry after deportation and alien smuggling. Rather, he provided instructions suggesting

11  that, in any event, any scruples LCW may have possessed were simply not capable of

12  expression in the context of grand jury service.

13            Now, the question is can you fairly evaluate [drug cases and immigration
              cases]? Just as the defendant is ultimately entitled to a fair trial and the person

14            that's accused is entitled to a fair appraisal of the evidence of the case that's in
              front of you, so, too, is the United States entitled to a fair judgment. If there's

15            probable cause, then the case should go forward. *I wouldn't want you to say*,
              "well, yeah, there's probable cause, but I still don't like what our government

16            is doing. I disagree with these laws, so I'm not going to vote for it to go
              forward." If that is your frame of mind, the probably you shouldn't serve.

17            Only you can tell me that.

18  *See id.* at 16-17 (emphasis added). Thus, without any sort of context whatsoever, Judge

19  Burns let the grand juror know that he would not want him or her to decline to indict in an

20  individual case where the grand juror "[didn't] like what our government is doing," *see id.*

21  at 17, but in which there was probable cause. *See id.* Such a case "should go forward." *See*

22  *id.* Given that blanket proscription on grand juror discretion, made manifest by Judge Burns'

23  use of the pronoun "I", the CSW indicated that it "would be difficult to support a charge even

24  if [the CSW] thought the evidence warranted it." *See id.* Again, Judge Burns' question

25  provided no context; he inquired regarding "a case," a term presumably just as applicable to

26  possession of a small amount of medical marijuana as kilogram quantities of

27  methamphetamine for distribution. Any grand juror listening to this exchange could only

28

1  conclude that there was *no* case in which Judge Burns would permit them to vote "no bill"

2  in the face of a showing probable cause.

3        Just in case there may have been a grand juror that did not understand his or her

4  inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home

5  in his exchange with REA.  REA first advised Judge Burns of a concern regarding the

6  "disparity between state and federal law" regarding "medical marijuana."  *See id.* at 24.

7  Judge Burns first sought to address REA's concerns about medical marijuana by stating that

8  grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into

9  account.

10        Well, those things -- the consequences of your determination shouldn't concern
      you in the sense that penalties or punishment, things like that -- we tell trial
11        jurors, of course, that they cannot consider the punishment or the consequence
      that Congress has set for these things.  We'd ask you to also abide by that.  We
12        want you to make a business-like decision of whether there was a probable
      cause. ...

13

14  *Id.* at 24-25.  Having stated that REA was to "abide" by the instruction given to trial jurors,

15  Judge Burns went on to suggest that REA recuse him or herself from medical marijuana

16  cases.  *See id.* at 25.

17        In response to further questioning, REA disclosed REA's belief "that drugs should be

18  legal."  *See id.*  That disclosure prompted Judge Burns to begin a discussion that ultimately

19  led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

20        I can tell you sometimes I don't agree with some of the legal decisions
      that are indicated that I have to make.  But my alternative is to vote for
21        someone different, vote for someone that supports the policies I support and
      get the law changed.  It's not for me to say, "well, I don't like it.  So I'm not
22        going to follow it here."
      You'd have a similar obligation as a grand juror even though you
23        might have to grit your teeth on some cases.  Philosophically, if you were a
      member of congress, you'd vote against, for example, criminalizing marijuana.
24        I don't know if that's it, but you'd vote against criminalizing some drugs.
      That's not what your prerogative is here.  You're prerogative instead
25        is to act like a judge and say, "all right.  This is what I've to  deal with
      objectively.  Does it seem to me that a crime was committed?  Yes.  Does it
26        seem to me that this person's involved?  It does."  *And then your obligation, if*
      *you find those to be true, would be to vote in favor of the case going forward.*

27

28

1    *Id.* at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part

2    test, which, if both questions are answered in the affirmative, lead to an "obligation" to

3    indict.

4            Having set forth the duty to indict, and being advised that REA was "uncomfortable"

5    with that paradigm, Judge Burns then set about to ensure that there was no chance of a

6    deviation from the obligation to indict in every case in which there was probable cause.

7            The Court: do you think you'd be inclined to let people go in drug cases even
             though you were convinced there was probable cause they committed a drug
8            offense?
             REA: It would depend on the case.
9            The Court: Is there a chance that you would do that?
             REA: Yes.
10           The Court: I appreciate your answers. I'll excuse you at this time.

11   *Id.* at 27. Two aspects of this exchange are crucial. First, REA plainly does not intend to act

12   solely on his political belief in decriminalization -- whether he or she would indict "depend[s]

13   on the case," *see id.*, as it should. Because REA's vote "depend[s] on the case," *see id.*, it is

14   necessarily true that REA would vote to indict in some (perhaps many or even nearly all)

15   cases in which there was probable cause.[6] Again, Judge Burns made no effort to explore

16   REA's views; he did not ascertain what sorts of cases would prompt REA to hesitate. The

17   message is clear: it does not matter what type of case might prompt REA's reluctance to

18   indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the

19   case going forward." *See id.* at 27. That is why even the "chance," *see id.*, that a grand juror

20   might not vote to indict was too great a risk to run.

21           In addition to his instructions on the authority to choose not to indict, Judge Burns

22   also assured the grand jurors that prosecutors would present to them evidence that tended to

23   undercut probable cause. *See id.* at 20.[7]

24

25

26           [6] That fact belies the government's claim that Judge Burns excused only prospective jurors
     who "expressed inability to apply the laws passed by Congress." *See* Exhibit B at 8.
27

28           [7] These instructions were provided in the midst of several comments that praised the United
     States attorney's office and prosecutors in general.

1       Now, again, this emphasizes the difference between the function of the grand
jury and the trial jury.  You're all about probable cause.  If you think that
2       there's evidence out there that might cause you to say "well, I don't think
probable cause exists," then it's incumbent upon you to hear that evidence as
3       well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to*
*present evidence that cuts against what they may be asking you to do if they're*
4       *aware of that evidence.*

5   *Id.* (emphasis added).[8]  The district court later returned to the notion of the prosecutors and

6   their duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will

7   appear in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in

8   all matters presented to you." *See id.* at 27.

9       In the general instructions, Judge Burns posits a duty on the part of the prosecutor to

10   present to the grand jurors evidence that tended to undercut probable cause. *See* Ex. A at 20.

11       Now, again, this emphasizes the difference between the function of the grand
jury and the trial jury.  You're all about probable cause.  If you think that
12       there's evidence out there that might cause you to say "well, I don't think
probable cause exists," then it's incumbent upon you to hear that evidence as
13       well.  As I told you, in most instances, the U.S. Attorneys are duty-bound to
present evidence that cuts against what they may be asking you to do if they're
14       aware of that evidence.

15   *Id.*  The antecedent to this instruction is also found in the impanelment.  After advising the

16   grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," *see*

17   Exhibit B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors

18   don't play hide-the-ball.  If there's something adverse or that cuts against the charge, you'll

19   be informed of that.  They have a duty to do that." *See id.*  Thus, Judge Burns unequivocally

20   advised the grand jurors that the government would present any evidence that was "adverse"

21   or "that cuts against the charge." *See id.*[9]

22

23       [8] The "in most instances" language suggests that there may be some limit on this principle.
Again, counsel has ordered the full transcript, and it will likely resolve the question posed in the
24   instant footnote.

25       [9] The impanelment instructions go even further.  In addressing a prospective grand juror who
26   revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Exhibit B at 38,
Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even
27   while purporting to discourage it: "frankly, I agree with the things you are saying.  They make sense
to me." *See id.* at 43. *See also id.* at 40 ("You were saying that you give a presumption of good faith
28   to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict

1  **B.  Argument**

2      i.        **Navarro-Vargas Establishes Limits on the Ability of Judges to Constrain**
          **the Powers of the Grand Jury.**
3

4      The Ninth Circuit has, over vigorous dissents, rejected challenges to various

5  instructions given to grand jurors in the Southern District of California.  *See Navarro-Vargas*

6  *II*, 408 F.3d 1184.  While the Ninth Circuit has thus far (narrowly) rejected such challenges,

7  it has, in the course of adopting a highly formalistic approach[10] to the problems posed by the

8  instructions, endorsed many of the substantive arguments raised by the defendants in those

9  cases.  The district court's instructions cannot be reconciled with the role of the grand jury

10 as set forth in *Navarro-Vargas II*.

11     For instance, with respect to the grand jury's relationship with the prosecution, the

12 *Navarro-Vargas II* majority acknowledges that the two institutions perform similar functions:

13 "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or

14 followed up, performs much the same function as a grand jury.'"  *Navarro-Vargas II*, 408

15 F.3d at 1200 (quoting *Butz v. Economou*, 438 U.S. 478, 510 (1978)).  *Accord Navarro-*

16 *Vargas I*, 367 F.3d at 900 (Kozinski, J., dissenting) (The grand jury's discretion in this regard

17 "is most accurately described as prosecutorial." ).  *See also Navarro-Vargas II*, 408 F.3d at

18 1213 (Hawkins, J., dissenting).  It recognizes that the prosecutor is not obligated to proceed

19 on any indictment or presentment returned by a grand jury, *id.*, but also that "the grand jury

20 has no obligation to prepare a presentment or to return an indictment drafted by the

21 prosecutor."  *Id.*  *See* Niki Kuckes, *The Democratic Prosecutor:  Explaining the*

22 *Constitutional Function of the Federal Grand Jury*, 94 Geo. L.J. 1265, 1302 (2006) (the

23 grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand

24 ———————————

25 innocent people or people that they believe to be innocent or the evidence doesn't substantiate the
   charges against.").
26

27    [10]  *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the
   majority because "[t]he instruction's use of the word 'should' is most likely to be understood as
28 imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's
   constitutional independence.").

1 | jury review from the perspective of those who insisted that a grand jury clause be included

2 | in the Bill of Rights'") (quoting Wayne LaFave et al., *Criminal Procedure* § 15.2(g) (2d ed.

3 | 1999)).

4 |      Indeed, the *Navarro-Vargas II* majority agrees that the grand jury possesses all the

5 | attributes set forth in *Vasquez v. Hillery*, 474 U.S. 254 (1986).  *See id.*

6 |      The grand jury thus determines not only whether probable cause exists, but
7 |      also whether to "charge a greater offense or a lesser offense; numerous counts
     or a single count; and perhaps most significant of all, a capital offense or a
     non-capital offense -- all on the basis of the same facts.  And, significantly, the
8 |      grand jury may refuse to return an indictment even "'where a conviction can
     be obtained.'"

9 |

10 | *Id.* (quoting *Vasquez*, 474 U.S. at 263).  The Supreme Court has itself reaffirmed *Vasquez*'s

11 | description of the grand jury's attributes in  *Campbell v. Louisiana*, 523 U.S. 392 (1998),

12 | noting that the grand jury "controls not only the initial decision to indict, but also significant

13 | questions such as how many counts to charge and whether to charge a greater or lesser

14 | offense, including the important decision whether to charge a capital crime."  *Id.* at 399

15 | (citing *Vasquez*, 474 U.S. at 263).    Judge Hawkins notes that the *Navarro-Vargas II*

16 | majority accepts the major premise of *Vasquez*: "the majority agrees that a grand jury has the

17 | power to refuse to indict someone even when the prosecutor has established probable cause

18 | that this individual has committed a crime." *See id.* at 1214 (Hawkins, J. dissenting).  *Accord*

19 | *Navarro-Vargas I*, 367 F.3d at 899 (Kozinski, J., dissenting); *Marcucci*, 299 F.3d at 1166-73

20 | (Hawkins, J., dissenting).  In short, the grand jurors' prerogative not to indict enjoys strong

21 | support in the Ninth Circuit.  But not in Judge Burns' instructions.

22 |      **ii.**        **The Instructions Forbid the Exercise of Grand Jury Discretion
Established in Both *Vasquez* and *Navarro-Vargas II*.**

23 |

24 |      The *Navarro-Vargas II* majority found that the instruction in that case "leave[s] room

25 | for the grand jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the

26 | analysis in its previous decision in *Marcucci*.  *Marcucci* reasoned that the instructions do not

27 | mandate that grand jurors indict upon every finding of probable cause because the term

28 | "should" may mean "what is probable or expected."  299 F.3d at 1164 (citation omitted).

1    That reading of the term "should" makes no sense in context, as Judge Hawkins ably pointed

2    out.    *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

3    instruction's use of the word 'should' is most likely to be understood as imposing an inflexible

4    'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional

5    independence."). *See also id.* ("The 'word' should is used to express a duty [or] obligation.")

6    (quoting *The Oxford American Diction and Language Guide* 1579 (1999) (brackets in

7    original)).

8        The debate about what the word "should" means is irrelevant here; the instructions

9    here make no such fine distinction.  The grand jury instructions make it painfully clear that

10    grand jurors simply may not choose not to indict in the event of what appears to them to be

11    an unfair application of the law: should "you disagree with that judgment made by Congress,

12    then your option is not to say 'well, I'm going to vote against indicting even though I think

13    that the evidence is sufficient'...." *See* Ex. A at 8-9.  Thus, the instruction flatly bars the

14    grand jury from declining to indict because they disagree with a proposed prosecution. No

15    grand juror would read this language as instructing, or even allowing, him or her to assess

16    "the need to indict." *Vasquez*, 474 U.S. at 264.

17        Nor does the *Navarro-Vargas II* majority's faith in the structure of the grand jury a

18    cure for the instructions excesses.  The *Navarro-Vargas II* majority attributes "[t]he grand

19    jury's discretion -- its independence -- [to] the absolute secrecy of its deliberations and vote

20    and the unreviewability of its decisions."  408 F.3d at 1200.  As a result, the majority

21    discounts the effect that a judge's instructions may have on a grand jury because "it is the

22    *structure* of the grand jury process and its *function* that make it independent." *Id.* at 1202

23    (emphases in the original).

24        Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes

25    that the 'structure' and 'function' of the grand jury -- particularly the secrecy of the

26    proceedings and unreviewability of many of its decisions -- sufficiently protects that power."

27    *See id.* at 1214 (Hawkins, J., dissenting).   The flaw in the majority's analysis is that

28    "[i]nstructing a grand jury that it lacks power to do anything beyond making a probable cause

1 determination ... unconstitutionally undermines the very structural protections that the

2 majority believes save[] the instruction." *Id.* After all, it is an "'almost invariable assumption

3 of the law that jurors follow their instructions.'" *Id.* (quoting *Richardson v. Marsh*, 481 U.S.

4 200, 206 (1987)). If that "invariable assumption" were to hold true, then the grand jurors

5 could not possibly fulfill the role described in *Vasquez*. Indeed, "there is something

6 supremely cynical about saying that it is fine to give jurors erroneous instructions because

7 nothing will happen if they disobey them." *Id.*

8       In setting forth Judge Hawkins' views, Ms. Martinez understands that this Court may

9 not adopt them solely because the reasoning that supports them is so much more persuasive

10 than the majority's sophistry. Rather, he sets them forth to urge the Court *not to extend* what

11 is already untenable reasoning.

12      Here, again, the question is not an obscure interpretation of the word "should", but an

13 absolute ban on the right to refuse to indict that directly conflicts with the recognition of that

14 right in *Vasquez*, *Campbell*, and both *Navarro-Vargas II* opinions. *Navarro-Vargas II* is

15 distinguishable on that basis, but not only that.

16      Judge Burns did not limit himself to denying the grand jurors the power that *Vasquez*

17 plainly states they enjoy. He also apparently excused prospective grand jurors who might

18 have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case,

19 because they could not adhere to [that] principle...." *See* Ex. A at 8. The structure of the

20 grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no

21 longer there, likely because they expressed their willingness to act as the conscience of the

22 community. *See Navarro-Vargas II*, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand

23 jury exercising its powers under *Vasquez* "serves ... to protect the accused from the other

24 branches of government by acting as the 'conscience of the community.'") (quoting *Gaither*

25 *v. United States*, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)). The federal courts possess

26 only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure,"

27 *United States v. Williams*, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned

28 his own rules and enforced them. The instructions here are therefore structural error. *See*

1  *Navarro-Vargas II*, 408 at 1216-17 (Hawkins, J., dissenting).   The indictment must be

2  dismissed.

3    **iii.        The Instructions Conflict With *Williams*' Holding that there Is No Duty
                  to Present Exculpatory Evidence to the Grand Jury.**

4

5      In *Williams*, the defendant, although conceding that it was not required by the Fifth

6  Amendment, argued that the federal courts should exercise their supervisory power to order

7  prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such

8  disclosure required by Fifth Amendment common law.  *See* 504 U.S. at 45, 51.  *Williams*

9  held that "as a general matter at least, no such 'supervisory' judicial authority exists."  *See id.*

10 at 47.   Indeed, although the supervisory power may provide the authority "to dismiss an

11 indictment because of misconduct before the grand jury, at least where that misconduct

12 amounts to a violation of one of those 'few, clear rules which were carefully drafted and

13 approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'"

14 *id.* at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of

15 prosecutorial conduct in the first instance." *Id.* at 47 (emphasis added).  The federal courts

16 possess only "very limited" power "to fashion, on their own initiative, rules of grand jury

17 procedure." *Id.* at 50.  As a consequence, *Williams* rejected the defendant's claim, both as

18 an exercise of supervisory power and as Fifth Amendment common law.  *See id.* at 51-55.

19     Despite the holding in *Williams*, the instructions here assure the grand jurors that

20 prosecutors would present to them evidence that tended to undercut probable cause.  *See* Ex.

21 A at 20.

22

23     Now, again, this emphasizes the difference between the function of the grand
       jury and the trial jury.  You're all about probable cause.  If you think that
       there's evidence out there that might cause you say "well, I don't think probable
24     cause exists," then it's incumbent upon you to hear that evidence as well.  As
       I told you, in most instances, *the U.S. Attorneys are duty-bound to present*
25     *evidence that cuts against what they may be asking you to do if they're aware*
       *of that evidence.*

26

27 *Id.* (emphasis added).   Moreover, the district court later returned to the notion of the

28 prosecutors and their duties, advising the grand jurors that they "can expect that the U.S.

1   Attorneys that will appear in from of [them] will be candid, they'll be honest, and ... they'll

2   act in good faith in all matters presented to you." *See id.* at 27.

3          This particular instruction has a devastating effect on the grand jury's protective

4   powers, particularly if it is not true.  It begins by emphasizing the message that *Navarro-*

5   *Vargas II* somehow concluded was not conveyed by the previous instruction: "You're all

6   about probable cause." *See* Ex. A at 20.  Thus, once again, the grand jury is reminded that

7   they are limited to probable cause determinations (a reminder that was probably unnecessary

8   in light of the fact that Judge Burns had already told the grand jurors that they likely would

9   be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors

10  that they should consider evidence that undercuts probable cause, but also advises the grand

11  jurors that the prosecutor will present it.  The end result, then, is that grand jurors should

12  consider evidence that goes against probable cause, but, if none is presented by the

13  government, they can  presume that there is none.  After all, "in most instances, the U.S.

14  Attorneys are duty-bound to present evidence that cuts against what they may be asking you

15  to do if they're aware of that evidence." *See id.*  Thus, if the exculpatory evidence existed,

16  it necessarily would have been presented by the "duty-bound" prosecutor, because the grand

17  jurors "can expect that the U.S. Attorneys that will appear in from of [them] will be candid,

18  they'll be honest, and ... they'll act in good faith in all matters presented to you." *See id.* at

19  27.

20         These instructions create a presumption that, in cases where the prosecutor does not

21  present exculpatory evidence, no exculpatory evidence exists.  A grand juror's reasoning, in

22  a case in which no exculpatory evidence was presented, would proceed along these lines:

23                    (1) I have to consider evidence that undercuts probable cause.
                      (2)  The candid, honest, duty-bound prosecutor would, in good faith,
24                    have presented any such evidence to me, if it existed.
                      (3)  Because no such evidence was presented to me, I may conclude
25                    that there is none.

26  Even if some exculpatory evidence were presented, a grand juror would necessarily presume

27  that the evidence presented represents the universe of all available exculpatory evidence; if

28  there was more, the duty-bound prosecutor would have presented it.

1    The instructions therefore discourage investigation–if exculpatory evidence were out

2    there, the prosecutor would present it, so investigation is a waste of time–and provide

3    additional support to every probable cause determination: i.e., this case may be weak, but I

4    know that there is nothing on the other side of the equation because it was not presented.  A

5    grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

6                                            **IV.**

7              **MOTION FOR LEAVE TO FILE FURTHER MOTIONS**

8    Ms. Martinez has received eighty-eight pages of discovery.  She requests leave to file

9    further motions if necessary.

10                                            **V.**

11                               **CONCLUSION**

12   Ms. Martinez requests this Court grant her motions.

13                                     Respectfully submitted,

14

15                                      /s/ Robert H. Rexrode
     Dated: December 25, 2007          **ROBERT H. REXRODE, III**
16                                      Attorney for Ms. Martinez
                                        robert_rexrode@rexrodelawoffices.com
17

18

19

20

21

22

23

24

25

26

27

28